**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN TEIXEIRA; STEVE NOBRIGA; GARY GAMAZA; CALGUNS FOUNDATION, INC., (CGF); SECOND AMENDMENT FOUNDATION, INC., (SAF); CALIFORNIA ASSOCIATION OF FEDERAL FIREARMS LICENSEES, (CAL-FFL), | No. 13-17132 |
| *Plaintiffs-Appellants*, | D.C. No. 3:12-cv-03288-WHO |
| v. | OPINION |
| COUNTY OF ALAMEDA; ALAMEDA COUNTY BOARD OF SUPERVISORS, as a policy making body; WILMA CHAN, in her official capacity; NATE MILEY, in his official capacity; KEITH CARSON, in his official capacity, | |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the Northern District of California
William Horsley Orrick, District Judge, Presiding

Argued and Submitted En Banc March 22, 2017
San Francisco, California

Filed October 10, 2017

Before:  Sidney R. Thomas, Chief Judge, and Stephen
Reinhardt, M. Margaret McKeown, Ronald M. Gould,
Richard A. Paez, Marsha S. Berzon, Richard C. Tallman,
Jay S. Bybee, Carlos T. Bea, Paul J. Watford and
John B. Owens, Circuit Judges.

Opinion by Judge Berzon;
Concurrence by Judge Owens;
Partial Concurrence and Partial Dissent by Judge Tallman;
Dissent by Judge Bea

# SUMMARY[*]

## Civil Rights

The en banc court affirmed the district court's dismissal, for failure to state a claim, of an action brought pursuant to 42 U.S.C. § 1983 alleging that the County of Alameda violated the Second Amendment when it denied individual plaintiffs conditional use permits to open a gun shop because the proposed location of the shop fell within a prohibited County zone.

The County of Alameda (1) requires firearm retailers to obtain a conditional use permit before selling firearms in the County and (2) prohibits firearm sales near residentially zoned districts, schools and day-care centers, other firearm retailers, and liquor stores. Plaintiffs challenged the County's zoning ordinance, alleging that by restricting their ability to open a new, full-service gun store, the ordinance infringed on their Second Amendment rights, as well as those of their potential customers.

The en banc court held that plaintiffs had not plausibly alleged that the County's ordinance impeded any resident of Alameda County who wished to purchase a firearm from doing so. Accordingly, plaintiffs failed to state a claim for relief based on infringement of the Second Amendment rights of their potential customers. The en banc court further held that plaintiffs could not state a Second Amendment claim based solely on the ordinance's restriction on their ability to

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*sell* firearms. The panel held that a textual and historical analysis of the Second Amendment demonstrated that the Constitution does not confer a freestanding right on commercial proprietors to sell firearms. Alameda County's zoning ordinance therefore survived constitutional scrutiny.

Concurring, Judge Owens joined all but Part II.D of the majority opinion. In Judge Owens' view, there was no need to decide whether the Second Amendment guarantees the right to sell firearms because the ordinance at issue here fell within that category of presumptively lawful regulatory measures, and plaintiffs therefore could not state a viable Second Amendment claim.

Concurring in part and dissenting in part, Judge Tallman concurred in the majority's decision to affirm the dismissal of the Second Amendment facial challenge. He dissented from the dismissal of the constitutional challenge as applied to plaintiffs, stating that the majority's analysis of the Second Amendment challenge to locating a full-service gun shop in an unincorporated area of Alameda County substantially interfered with the right of its customers to keep and bear arms.

Dissenting, Judge Bea stated that neither the historical evidence nor the language of *District of Columbia v. Heller*, 554 U.S. 570 (2008) supported the majority's conclusion that the Second Amendment offers no protection against regulations on the sale of firearms.

**COUNSEL**

Donald E. J. Kilmer, Jr. (argued), San Jose, California, for Plaintiffs-Appellants.

Brian P. Goldman (argued), Orrick Herrington & Sutcliffe LLP, San Francisco, California; Donna R. Ziegler, County Counsel; Office of the County Counsel, County of Alameda, Oakland, California; for Defendants-Appellees.

Alan Gura, Gura & Possessky PLLC, Alexandria, Virginia, for Amicus Curiae Citizens Committee for the Right to Keep and Bear Arms.

Imran A. Khaliq, Arent Fox LLP, San Francisco, California; Laura J. Edelstein, Steptoe & Johnson LLP, Palo Alto, California; for Amici Curiae Law Center to Prevent Gun Violence, and Youth Alive!

T. Peter Pierce and Stephen D. Lee, Richards Watson & Gershon APC, Los Angeles, California, for Amici Curiae League of California Cities, and California State Association of Counties.

Kathryn Marshall Ali, Anna M. Kelly, and Adam K. Levin, Hogan Lovells US LLP, Washington, D.C.; Jasmeet K. Ahuja, Hogan Lovells US LLP, Philadelphia, Pennsylvania; Kelly Sampson, Avery Gardiner, Alla Lefkowitz, and Jonathan Lowy, Brady Center to Prevent Gun Violence; for Amicus Curiae Brady Center to Prevent Gun Violence.

Lisa Hill Fenning, Amanda Semaan, Eric D. Mason, and Stephanie N. Kang, Arnold & Porter LLP, Los Angeles, California; Anton A. Ware and David A. Caine, Arnold &

Porter LLP, San Francisco, California; for Amicus Curiae Dean Erwin Chemerinsky.

Peter H. Chang, Deputy Attorney General; Marc A. LeForestier, Supervising Deputy Attorney General; Douglas J. Woods, Senior Assistant Attorney General; Kathleen A. Kenealy, Chief Assistant Attorney General; Edward C. DuMont, Solicitor General; Office of the Attorney General, San Francisco, California; for Amicus Curiae State of California.

Eugene Volokh, Los Angeles, California, for Amici Curiae Professors Randy Barnett, Robert J. Cottrol, Brannon Denning, Michael O'Shea, and Glenn Harlan Reynolds, and The Firearms Policy Foundation.

Bradley A. Benbrook and Stephen M. Duvernay, Benbrook Law Group PC, Sacramento, California, for Amici Curiae Firearms Policy Coalition, Golden State Second Amendment Council, Madison Society Foundation, Commonwealth Second Amendment Inc., Gun Owners of California, and San Diego County Gun Owners Political Action Committee.

Craig A. Livingston and Crystal L. Van Der Putten, Livingston Law Firm P.C., Walnut Creek, California; Lawrence G. Keane, General Counsel, The National Shooting Sports Foundation Inc., for Amicus Curiae The National Shooting Sports Foundation Inc.

Paul D. Clement, Erin E. Murphy, and Christopher G. Michel, Kirkland & Ellis LLP, Washington, D.C.; C.D. Michel, Michel & Associates P.C., Long Beach, California; for Amici Curiae National Rifle Association of America Inc., and California Rifle & Pistol Association.

Joseph G.S. Greenlee, Jolein A. Harro P.C., Steamboat Springs, Colorado; David B. Kopel, Independence Institute, Denver, Colorado; for Amici Curiae Jews for the Preservation of Firearms Ownership, and The Independence Institute.

---

**OPINION**

BERZON, Circuit Judge:

The County of Alameda seeks to preserve the health and safety of its residents by (1) requiring firearm retailers to obtain a conditional use permit before selling firearms in the County and (2) prohibiting firearm sales near residentially zoned districts, schools and day-care centers, other firearm retailers, and liquor stores. The individual plaintiffs in this case, John Teixeira, Steve Nobriga, and Gary Gamaza (collectively, "Teixeira"), wished to open a gun shop but were denied a conditional use permit because the proposed location of their gun shop fell within a prohibited zone. Teixeira challenges the County's zoning ordinance, alleging that by restricting his ability to open a new, full-service gun store, the ordinance infringes on his Second Amendment rights, as well as those of his potential customers.

Teixeira has not, however, plausibly alleged that the County's ordinance impedes any resident of Alameda County who wishes to purchase a firearm from doing so. Accordingly, he has failed to state a claim for relief based on infringement of the Second Amendment rights of his potential customers. And, we are convinced, Teixeira cannot state a Second Amendment claim based solely on the ordinance's restriction on his ability to *sell* firearms. A textual and historical analysis of the Second Amendment demonstrates

that the Constitution does not confer a freestanding right on commercial proprietors to sell firearms. Alameda County's zoning ordinance thus survives constitutional scrutiny.

## I. Background

### A.

In the fall of 2010, Teixeira, Nobriga, and Gamaza formed a partnership, Valley Guns and Ammo, with the intention of opening a gun store in Alameda County, California. After conducting local market research among gun enthusiasts, Teixeira concluded that there was a demand for a full service gun store in an unincorporated area of Alameda County called San Lorenzo, near the incorporated city of San Leandro. In response to this demand, Teixeira intended to open a specialty shop that would sell new and used firearms and ammunition and would also provide gun repairs, gun smithing, appraisals, and training and certification in firearm safety.

Teixeira contacted the Alameda County Planning Department for information as to any land use or other permits necessary to open a gun store in unincorporated areas of the County.[1] The Planning Department informed Teixeira

---

[1] Regulations enacted by California counties are effective only in unincorporated areas, as city governments exercise regulatory authority within city boundaries. *See* Cal. Const. art. XI, § 7 ("A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."); *City of S. San Francisco v. Berry*, 120 Cal. App. 2d 252, 253 (Cal. Dist. Ct. App. 1953) (explaining that when unincorporated land is annexed by a city it leaves "the territorial jurisdiction of the county" and thus "cease[s] to be within [the county's] limits") (internal quotation marks omitted).

that because he intended to sell firearms, he would need to obtain a Conditional Use Permit pursuant to Alameda County Ordinance Sections 17.54.130 *et seq.* Conditional Use Permits are required for certain land uses and are granted after a special review in which the County determines whether or not the proposed business (1) is required by public need; (2) is properly related to other land uses and transportation and service facilities in the area; (3) if permitted, will materially and adversely affect the health or safety of persons residing or working in the vicinity; and (4) will be contrary to the specific performance standards established for the area. Alameda Cty., Cal., Code § 17.54.130.

The County informed Teixeira that to receive a Conditional Use Permit for his proposed gun store, he also had to comply with Alameda County Ordinance Section 17.54.131 (the "Zoning Ordinance"). That ordinance requires, among other things, that businesses selling firearms in unincorporated areas of the County be located at least five hundred feet away from any of the following: schools, day care centers, liquor stores or establishments serving liquor, other gun stores, and residentially zoned districts.[2]

---

[2] The ordinance provides in relevant part that "no conditional use permit for firearms sales shall issue unless the following additional findings are made by the board of zoning adjustments based on sufficient evidence. . . (B) That the subject premises is not within five hundred (500) feet of any of the following: Residentially zoned district; elementary, middle or high school; pre-school or day care center; other firearms sales business; or liquor stores or establishments in which liquor is served . . . ." Alameda Cty., Cal., Code § 17.54.131.

The ordinance additionally requires that: (1) the proposed district is appropriate for firearm sales activity, (2) the applicant possess all firearms

Based on this guidance, Teixeira identified a suitable rental property at 488 Lewelling Boulevard in unincorporated Alameda County.[3]  Teixeira obtained a survey that showed, based on door-to-door measurements,[4] that the property was more than 500 feet from any disqualifying property under the Zoning Ordinance.  Teixeira began arranging with the landlord to lease the Lewelling Boulevard property and to make the modifications necessary to transform the space into a gun store compliant with all state and federal regulations.

Teixeira then applied to the Alameda County Community Development Agency for a Conditional Use Permit for his planned store.  Staff of the Alameda County Community Development Agency Planning Department ("Planning Department") prepared a report for the West County Board of Zoning Adjustments ("Zoning Board") on Teixeira's application.  The staff report made the following findings: there was a public need for a licensed firearms dealer; the

---

dealer licenses required by federal and state law, (3) the applicant obtain a firearms dealer license from Alameda County before commencing sales, (4) the premises fully comply with applicable building, fire, and other technical codes, and (5) the applicant has provided sufficient detail regarding intended compliance with California penal code requirements for safe storage of firearms and ammunition at the premises.  *Id.*

[3] The parties and record variously locate 488 Lewelling Boulevard in San Lorenzo (an unincorporated area of the County), Ashland (another unincorporated area of the County), and San Leandro (an incorporated city in the County).  The parties are agreed, however, that the property is located somewhere in unincorporated Alameda County.

[4] Teixeira maintains that the County informed him that, for purposes of compliance with the 500-foot rule, measurements should be taken from the closest door of the intended store to the front door of any disqualifying property.

proposed use was compatible with other land uses and transportation in the area; and a gun shop at the proposed site would not adversely affect the health or safety of persons living and working in the vicinity. The staff report also found, however, that the site of the proposed gun shop did not satisfy the Zoning Ordinance's distance requirements, because it was approximately 446 feet from two residential properties in different directions. The staff report's distance calculation was based on measurement from the closest exterior wall of the proposed gun shop to the property lines of the disqualifying properties. The staff report thus recommended denying Teixeira's permit application.

The Zoning Board held a public hearing on Teixeira's Conditional Use Permit application. Teixeira appeared at the hearing and offered testimony in support of his application; neighborhood residents also appeared, some testifying in support of the application and others in opposition.

After the hearing, the Planning Department issued a revised staff report. That report acknowledged the ambiguity in the Zoning Ordinance regarding how the 500 feet should be measured for the purpose of determining compliance. The report nevertheless concluded that the proposed gun store location was less than 500 feet from the property line of the closest residentially zoned district, whether measured from the exterior wall, front door, or property line of the proposed gun shop.[5] The Planning Department staff therefore again

---

[5] The County rejected Teixeira's suggestion that the distance should be measured from the proposed site to the closest door of a dwelling in the residentially zoned district, rather than to the closest property line of a residential district. The ordinance states that the property proposed for firearm sales shall not be within five hundred feet of a "[r]esidentially

recommended denying Teixeira a Conditional Use Permit and variance.

Notwithstanding this recommendation, the Zoning Board passed a resolution granting Teixeira a variance from the Zoning Ordinance and approving his application for a Conditional Use Permit. The Zoning Board concluded that a gun shop at the proposed location would not be detrimental to the public welfare and warranted a variance in light of the physical buffer created by a major highway between the proposed site and the nearest residential district. The Zoning Board also determined that there was a public need for a licensed firearms retailer in the neighborhood.

Shortly after the County granted Teixeira's permit application, the San Lorenzo Village Homes Association filed an appeal challenging the Zoning Board's resolution. Acting through three of its members, the Board of Supervisors voted to sustain the appeal, overturning the Zoning Board's decision and revoking the Conditional Use Permit.

After the permit was revoked, Teixeira alleges, he was unable to identify any property in unincorporated Alameda County that satisfied the ordinance's 500-foot rule and was otherwise suitable—in terms of location, accessibility, building security, and parking—for a gun shop. Teixeira later commissioned a study to analyze the practical implications of the Zoning Ordinance for opening a gun store in unincorporated areas of the County. The study found it "virtually impossible to open a gun store in unincorporated

---

zoned district," foreclosing Teixeira's proposal that the measurement should be taken from the door of an actual dwelling. *See* Alameda Cty., Cal., Code § 17.54.131.

Alameda County" that would comply with the 500-foot rule "due to the density of disqualifying properties."**[6]**

## B.

Joined by institutional plaintiffs The Calguns Foundation, Inc., Second Amendment Foundation, and California Association of Federal Firearms Licensees, Inc., Teixeira filed a complaint in federal district court challenging the Board of Supervisors' decision to deny him a variance and Conditional Use Permit. The challenge was premised on due process, equal protection, and Second Amendment grounds, and alleged violations of Teixeira's own rights as well as those of his prospective customers. Alameda County filed a motion to dismiss the complaint for failure to state a claim, which the district court granted, with leave to amend; Teixeira also filed a motion for a preliminary injunction, which the district court denied. The plaintiffs thereupon filed an amended complaint, which the district court likewise dismissed for failure to state a claim, this time without leave to amend.

---

**[6]** As of 2009, the total population of unincorporated areas of Alameda County was 142,166, approximately 9% of the total County population of 1,556,657. *See* Alameda County Community Development Agency, *2009 Population and Housing Estimates for Alameda County and its Cities*, Pub. No. 09-10 (May 2009), http://www.co.alameda.ca.us/about/documents/AlaCtyPopHsng2009.pdf. We take judicial notice of these undisputed facts regarding the County's population. *See* Fed. R. Evid. 201(b); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (holding that a court may take judicial notice of "matters of public record" that are not subject to reasonable dispute) (internal quotation marks omitted). The unincorporated areas of Alameda County are non-contiguous. Teixeira's proposed gun store—at 488 Lewelling Boulevard—would lie in an unincorporated sliver of land between the incorporated cities of Hayward and San Leandro.

A three-judge panel of this court affirmed the district court's dismissal of Teixeira's Equal Protection Clause claims but reversed the district court's dismissal of Teixeira's Second Amendment Claims, remanding for further proceedings.[7]  *See Teixeira v. County of Alameda*, 822 F.3d 1047 (9th Cir. 2016).  Judge Silverman dissented from the Second Amendment holding.  *See id.* at 1064 (Silverman, J., dissenting).

II.

A.

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  As interpreted in recent years by the Supreme Court, the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) ("[O]ur central holding in *Heller* [was] that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.").

After *Heller*, this court and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense.  For example, we held in *Jackson*

---

[7] Teixeira did not seek rehearing of the panel's rejection of his Equal Protection claims.  We affirm the district court on that claim for the reasons given in the panel opinion.

*v. City and County of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2799 (2015), that a prohibition on the sale of certain types of ammunition burdened the core Second Amendment right and so was subject to heightened scrutiny. *Jackson* involved a challenge by handgun owners to a San Francisco ordinance that prohibited the sale of particularly lethal ammunition, including hollow-point ammunition, within the City and County of San Francisco. *Id.* at 958. We recognized in *Jackson* that, although the Second Amendment "does not explicitly protect ammunition . . . , without bullets, the right to bear arms would be meaningless." *Id.* at 967. *Jackson* thus held that "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Id.* (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).**[8]**

---

**[8]** *Jackson* went on to hold that the prohibition on the sale of hollow-point ammunition "burden[ed] the core right of keeping firearms for self-defense only indirectly" and insubstantially, because San Francisco citizens were not precluded from using hollow-point ammunition in San Francisco if obtained elsewhere, and because the ordinance applied only to certain types of ammunition. 746 F.3d at 968. Applying intermediate scrutiny, *Jackson* then held the ordinance did not violate the Second Amendment, as the regulation of lethal ammunition was justified by the legitimate and compelling government interest in reducing the fatality of shootings. *Id.* at 970.

*Jackson* also involved a challenge to a San Francisco ordinance that required that handguns be stored in locked containers or disabled with trigger locks when not carried on the person. *Jackson*, 746 F.3d at 958. *Jackson* upheld that ordinance, holding (1) that the ordinance regulated conduct falling within the scope of the Second Amendment, (2) but did not place a substantial burden on core Second Amendment conduct and therefore triggered only intermediate scrutiny, and (3) applying intermediate scrutiny, the ordinance passed constitutional muster. *Id.* at 963–66.

Similarly, in *Ezell v. City of Chicago* ("*Ezell I*"), the Seventh Circuit held that an ordinance banning firearm ranges within the city of Chicago was not categorically unprotected by the Second Amendment and so demanded constitutional scrutiny. 651 F.3d at 704–06. *Ezell I* held that the Chicago ordinance, coupled with a law requiring range training as a prerequisite to obtaining a firearm permit, encroached on "the right to maintain proficiency in firearms use, an important corollary to the meaningful exercise of the core right to possess firearms for self-defense." *Id.* at 708. This core right to possess firearms, *Ezell I* explained, "wouldn't mean much without the training and practice that make it effective." *Id.* at 704. *Ezell I* relied on *Heller*, which quoted an 1868 treatise on constitutional law observing that "to bear arms implies something more than the mere keeping; it implies the learning to handle and use them." *Id.* (quoting *Heller*, 554 U.S. at 617–18).

As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense "wouldn't mean much" without the ability to acquire arms. *Id.*; *see Jackson*, 746 F.3d at 967. The Tennessee Supreme Court cogently observed in 1871, interpreting that state's constitution, that "[t]he right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair." *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178 (1871); *see also Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) (emphasis in original) ("[T]he right to keep and bear arms for self-defense under the Second Amendment . . . must also include the right to *acquire* a firearm, although that acquisition right is far from absolute . . . .").

We need not define the precise scope of any such acquisition right under the Second Amendment to resolve this case. Whatever the scope of that right, Teixeira has failed to state a claim that the ordinance impedes Alameda County residents from acquiring firearms.

## B.

"[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." *Craig v. Boren*, 429 U.S. 190, 195 (1976). Teixeira, as the would-be operator of a gun store, thus has derivative standing to assert the subsidiary right to acquire arms on behalf of his potential customers. *See also Carey v. Population Servs., Int'l*, 431 U.S. 678, 683 (1977); *Ezell I*, 651 F.3d at 693, 696 (supplier of firing-range facilities had standing to challenge Chicago ordinance banning firing ranges on behalf of potential customers).

But Teixeira did not adequately allege in his complaint that Alameda County residents cannot purchase firearms within the County as a whole, or within the unincorporated areas of the County in particular. To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege in the complaint "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). We assume the factual allegations in Teixeira's complaint to be true. *See id*. But "[c]onclusory allegations and unreasonable

inferences . . . are insufficient to defeat a motion to dismiss." *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007).

The operative complaint does not meet this standard with regard to whether residents can purchase guns in the County—or in unincorporated areas of the County—if they choose to do so.[9]  Teixeira alleges in general terms that the gun store he plans to open is necessary to enable his potential customers to exercise their Second Amendment rights.  The complaint also states that the zoning ordinance amounts to a complete ban on new gun stores in unincorporated Alameda County because, according to a study commissioned by Teixeira, "there are no parcels in the unincorporated areas of Alameda County which would be available for firearm retail sales."

Whatever the standard governing the Second Amendment protection accorded the acquisition of firearms,[10] these vague

---

[9] We note that *Jackson* suggests that the proper inquiry regarding accessibility may not be limited to a particular jurisdiction. *Jackson* held that although San Francisco's prohibition on the sale of hollow-point ammunition burdens core Second Amendment rights, it does so only indirectly, because a local resident "is not precluded from using the hollow-point bullets in her home if she purchases such ammunition outside of San Francisco's jurisdiction."  746 F.3d at 968.

[10] "In *Heller*, the Supreme Court did not specify what level of scrutiny courts must apply to a statute challenged under the Second Amendment," although the Court did "indicate that rational basis review is not appropriate."  *United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 187 (2014) (citing *Heller*, 554 U.S. at 628 n.27).  In this Circuit, we have likewise not identified a uniform standard of scrutiny that applies to regulations that burden the Second Amendment, either generally or as to particular categories of regulations.  We have instead held that "the level of scrutiny should depend on (1) 'how close

allegations cannot possibly state a claim for relief under the Second Amendment. The exhibits attached to and incorporated by reference into the complaint, which we may consider, *see United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003), demonstrate that Alameda County residents may freely purchase firearms within the County.[11] As of December 2011, there were ten gun stores in Alameda County.[12] Several of those stores are in the non-contiguous, unincorporated portions of the County. In fact, Alameda County residents can purchase guns approximately 600 feet away from the proposed site of Teixeira's planned store, at a Big 5 Sporting Goods store.

*Ezell v. City of Chicago* ("*Ezell II*"), 846 F.3d 888 (7th Cir. 2017), involved an entirely different situation with regard to the availability of a gun-related service to county residents. Chicago's zoning regulations at issue in that case so "severely limit[ed] where shooting ranges may locate" that "*no* publicly accessible shooting range yet exist[ed] in Chicago." *Id.* at 894. (emphasis added). As a result, the zoning regulations, "though not on their face an outright prohibition of gun ranges, nonetheless severely restrict the right of Chicagoans

---

the law comes to the core of the Second Amendment right' and (2) 'the severity of the law's burden on the right.'" *Id.* at 1138 (quoting *Ezell I*, 651 F.3d at 703); *see also Jackson*, 746 F.3d at 960–61.

[11] Throughout this opinion, when we refer to the complaint, we include the supporting attachments.

[12] As discussed, *supra* note 6, the unincorporated areas of Alameda County are noncontiguous, and the site Teixeira selected for his gun shop lies in a small unincorporated area adjacent to incorporated population centers. The site is relatively distant from the less urban, less populated parts of the County.

to train in firearm use at a range." *Id.* No analogous restriction on the ability of Alameda County residents to purchase firearms can be inferred from the complaint in this case.

The closest Teixeira comes to stating a claim that his potential customers' Second Amendment rights have been, or will be, infringed is his allegation that the ordinance places "a restriction on convenient access to a neighborhood gun store and the corollary burden of having to travel to other, more remote locations to exercise their rights to acquire firearms and ammunition in compliance with the state and federal laws."    But potential gun buyers in Alameda County generally, and potential gun buyers in the unincorporated areas around San Lorenzo in particular, *do* have access to a local gun store just 600 feet from where Teixeira proposed to locate his store.  And if the Big 5 Sporting Goods store does not meet their needs, they can visit any of the nine other gun stores in the County as a whole, including the three other gun stores in the unincorporated parts of the County.[13]

In any event, gun buyers have no right to have a gun store in a particular location, at least as long as their access is not

---

[13] The complaint also alleges that current firearms retailers in the area do not "meet customer needs and demands" and do not provide "the level of personal service" that Teixeira's proposed store would provide.  No case supports Teixeira's suggestion that the Second Amendment not only encompasses a right to acquire firearms but guarantees a certain type of retail experience.

In addition, counsel for Teixeira stated at oral argument that Big 5 Sporting Goods does not sell handguns.  That allegation is not in the complaint.  Moreover, counsel for Teixeira did not contend that handguns are not available for purchase at other stores in Alameda County.

meaningfully constrained. *See Second Amendment Arms v. City of Chicago*, 135 F. Supp. 3d 743, 754 (N.D. Ill. 2015) ("[A] slight diversion off the beaten path is no affront to . . . Second Amendment rights."); *cf. Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2313 (2016), *as revised* (June 27, 2016) ("[I]ncreased driving distances do not always constitute an 'undue burden.'"); *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1228 (11th Cir. 2004) (holding that a zoning ordinance that limited churches and synagogues to residential districts did not violate the Religious Land Use and Institutionalized Persons Act (RLUIPA) because "walking a few extra blocks" is not a substantial burden).

We recognized a similar principle in *Jackson.* After recognizing that San Francisco's ban on the sale of certain particularly lethal ammunition *did* regulate conduct within the scope of the Second Amendment, we held that the regulation burdened the core right only indirectly, in part because handgun owners in San Francisco could freely obtain the banned ammunition in other jurisdictions and keep it for use within city limits. *Jackson*, 746 F.3d at 968. As *Jackson* illustrates, the Second Amendment does not elevate convenience and preference over all other considerations.[14]

---

[14] Judge Bea's dissent argues, *post* at 52, that we misread *Chovan* by declining to apply constitutional scrutiny to the Ordinance unless it "meaningfully" burdens the Second Amendment rights of would-be gun buyers. Not so. There is no *meaningful* difference—that is, one that matters—between failing to plead that "the ordinance meaningfully inhibits residents from acquiring firearms within their jurisdiction," *infra*, and failing to plead that the ordinance actually or really burdens these residents' Second Amendment rights.

Moreover, Teixeira does not make any allegations about how far his potential customers currently travel to purchase firearms, or how much the proposed store would shorten travel distances, if at all, or for whom. Nor does Teixeira make any argument as to what distance necessarily impairs Second Amendment rights.

In sum, based on the allegations in the complaint, Teixeira fails to state a plausible claim on behalf of his potential customers that the ordinance meaningfully inhibits residents from acquiring firearms within their jurisdiction.[15] As Judge Silverman observed in his dissent from the panel opinion, "[c]onspicuously missing from this lawsuit is any honest-to-God resident of Alameda County complaining that he or she cannot lawfully buy a gun nearby." *Teixeira*, 822 F.3d at 1064 (Silverman, J., dissenting). Similarly missing is any allegation by Teixeira that any "honest-to-God resident of Alameda County . . . cannot lawfully buy a gun nearby." *Id.*

In short, because the allegations in the complaint, read in light of the attachments and judicially noticeable information about the population and geography of Alameda County, do not plausibly raise a claim of entitlement to relief, the district court properly dismissed at the pleadings stage Teixeira's claim that the ordinance infringes the Second Amendment

---

[15] Teixeira waived his right to amend the complaint. When the district court asked whether he would like an opportunity to amend the pleadings, counsel for Teixeira declined, noting "we have pled the sufficient facts." Moreover, the attachments to the complaint demonstrate that individuals in unincorporated Alameda County can purchase guns from several retail outlets, so any allegation that the ordinance poses a meaningful obstacle to acquiring firearms would be implausible.

rights of his potential customers. *See Twombly*, 550 U.S. at 556–58.

## C.

Teixeira also fails to state a claim for relief insofar as he alleges that the ordinance interferes with the provision of ancillary training and certification services in Alameda County. Teixeira maintains that existing firearm retail establishments in Alameda County do not meet "customer needs and demands" with respect to personalized training and instruction in firearms safety and operation, services Teixeira planned to provide.

The claim that the ordinance burdens his potential customers' Second Amendment rights to obtain necessary firearms instruction and training is belied by the ordinance itself. The Zoning Ordinance limits the location of premises conducting "firearm sales." Alameda Cty., Cal., Code § 17.54.131. It does not concern businesses providing firearms instruction and training services. Accordingly, the Zoning Ordinance would pose no obstacle if Teixeira wanted to open a business at the proposed site on Lewelling Boulevard to provide firearms instruction and training.

This case is therefore entirely unlike the *Ezell* cases. The ordinance in *Ezell I* expressly banned publicly accessible firing ranges in the entire city of Chicago. 651 F.3d at 691. The zoning ordinance in *Ezell II*, although not an outright ban, so severely limited the potential locations for operating a range that less than three percent of the city's total acreage was even theoretically available to site a range, and no range yet existed in the city. 846 F.3d at 894. The ordinances in those cases thus directly, and meaningfully, interfered with

the ability of city residents to maintain firearms proficiency, a right the Seventh Circuit found to be an "important corollary" to the core right to bear arms. *Ezell I*, 651 F.3d at 708.

No such interference can be shown in this case, as the ordinance restricts the location of firearm sales, not training. Teixeira thus fails to state a Second Amendment claim related to the provision of ancillary firearms training and certification services.

## D.

Teixeira also suggests that, independent of the rights of his potential customers, the Second Amendment grants him a right to *sell* firearms. In other words, his contention is that even if there were a gun store on every square block in unincorporated Alameda County and therefore prospective gun purchasers could buy guns with exceeding ease, he would still have a right to establish his own gun store somewhere in the jurisdiction. He alleges that the Zoning Ordinance infringes on that right by making it virtually impossible to open a new gun store in unincorporated Alameda County.[16]

---

[16] The complaint does not address whether Teixeira could open a gun store in an incorporated area in the vicinity of the proposed site, nor does it allege that Teixeira has any particular reason for wishing to locate a store in the unincorporated areas of the County (such as proximity to the residence of the owners). Although a number of Alameda County municipalities regulate the location of firearms sales, *see, e.g.*, Oakland, Cal., Mun. Code § 5.26.070(I), the complaint provides no information as to whether there are viable locations in those municipalities or any others in the County in which a new gun store could be located. Notably, 91% of the County's residents live in incorporated areas, *see supra* note 6. We need not determine, however, whether the complaint plausibly alleges

We apply a two-step inquiry to examine Teixeira's claim. *See Chovan*, 735 F.3d at 1136. We first ask "whether the challenged law burdens conduct protected by the Second Amendment," and, if so, we then determine the "appropriate level of scrutiny." *Id.*

If we conclude that the ordinance imposes no "burden on conduct falling within the scope of the Second Amendment's guarantee . . . our inquiry is complete," *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010), as a law that "burdens conduct that falls outside the Second Amendment's scope, . . . passes constitutional muster." *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 195 (5th Cir. 2012). *See also Peruta v. Cty. of San Diego*, 824 F.3d 919, 939 (9th Cir. 2016) (en banc), *cert. denied sub nom. Peruta v. California*, 137 S. Ct. 1995 (2017) ("Because the Second Amendment does not protect in any degree the right to carry concealed firearms in public, any prohibition or restriction a state may choose to impose on concealed carry . . . is necessarily allowed by the Amendment.").

At the first step of the inquiry, "determining the scope of the Second Amendment's protections requires a textual and historical analysis of the amendment." *Chovan*, 735 F.3d at 1133; *see also Ezell I*, 651 F.3d at 701. Based on such an analysis, we conclude that the Second Amendment does not confer a freestanding right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms. Commerce in

---

meaningful interference with Teixeira's sale of firearms, as we conclude that the Second Amendment does not independently protect the ability to engage in gun sales.

firearms is a necessary prerequisite to keeping and possessing arms for self-defense, but the right of gun users to acquire firearms legally is not coextensive with the right of a particular proprietor to sell them.

The Supreme Court in *Heller* was careful so to caution, even while striking down a statute banning handgun possession in the home: "[N]othing in our opinion should be taken to cast doubt on . . . laws imposing conditions and qualifications on the commercial sale of arms."  554 U.S. at 626–27.  These types of regulations, *Heller* explained, are examples of "presumptively lawful regulatory measures."  *Id.* at 627 n.26.  Two years later, the Supreme Court repeated that *Heller* "did not cast doubt on such longstanding regulatory measures."  *McDonald*, 561 U.S. at 786.  The Supreme Court's assurance in this regard guided our analysis in *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc), in which we upheld an Alameda County ordinance that regulated the manner of displaying firearms at gun shows on County property.

*Heller*'s assurance that laws imposing conditions and qualifications on the commercial sale of firearms are presumptively lawful makes us skeptical of Teixeira's claim that retail establishments can assert an independent, free-standing right to sell firearms under the Second Amendment. The language in *Heller* regarding the regulation of "the commercial sale of arms," however, is sufficiently opaque with regard to that issue that, rather than relying on it alone to dispose of Teixeira's claim, we conduct a full textual and historical review.

### i. Text

We begin with text of the Second Amendment. *See Heller*, 554 U.S. at 576. Nothing in the specific language of the Amendment suggests that sellers fall within the scope of its protection.

After its introductory language,[17] the Second Amendment commands that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. That language confers a right on the "people" who would keep and use arms, not those desiring to sell them.

The operative language—"keep" and "bear"—confirms that focus. As *Heller* observed, "the most natural reading of 'keep Arms' . . . is to 'have weapons.'" *Heller*, 554 U.S. at 582. And "bear arms" is naturally read to mean "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in case of conflict with another person." *Id.* at 584 (omissions in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). Nothing in the text of the Amendment, as interpreted authoritatively in *Heller*, suggests the Second Amendment confers an independent right to sell or trade weapons.

---

[17] The introductory clause of the Second Amendment reads: ''A well regulated Militia, being necessary to the security of a free State . . . .'' U.S. Const. amend. II. *Heller* held that this clause "announces the purpose for which the right was codified: to prevent elimination of the militia." 554 U.S. at 599. That purpose reflected the widely held belief at the time the Amendment was adopted that a "citizen militia . . . might be necessary to oppose an oppressive military force if the constitutional order broke down." *Id.*

Second Amendment analogues in state constitutions adopted during the founding period likewise expressly refer to the right of the people to bear arms, nowhere suggesting in their text that the constitutional protection extends to those who would engage in firearms commerce. *See, e.g.*, Pa. Declaration of Rights, § XIII (1776) ("That the people have a right to bear arms for the defence of themselves and the state . . . ."); Mass. Const., Pt. First, art. XVII (1780) ("The people have a right to keep and to bear arms for the common defence."); Ky. Const., art. XII, § 23 (1792) ("That the right of the citizens to bear arms in defence of themselves and the State shall not be questioned."); Ohio Const., art. VIII, § 20 (1802) ("That the people have a right to bear arms for the defence of themselves and the State . . . .").

### ii. The Right to Bear Arms in Britain and Colonial America

The historical record confirms that the right to sell firearms was not within the "historical understanding of the scope of the [Second Amendment] right." *Jackson*, 746 F.3d at 959 (alteration in original) (quoting *Heller*, 554 U.S. at 625). The Supreme Court held in *Heller* that the Second Amendment "codified a pre-existing right," 554 U.S. at 592 (emphasis omitted), a "right inherited from our English ancestors," *id.* at 599 (internal quotation marks omitted). *Heller* and later cases scrutinizing firearms restrictions thus examined the nature of the right to bear arms in England, colonial America, and during the Founding. *See id.* at 584–610; *McDonald*, 561 U.S. at 768–78; *Peruta*, 824 F.3d at 929–39. *Heller*, *McDonald*, *Peruta*, and other cases provide thorough historical accounts, so we do not repeat that full history of the Second Amendment here. Instead, we highlight the historical evidence that demonstrates that the

right codified in the Second Amendment did not encompass a freestanding right to engage in firearms commerce divorced from the citizenry's ability to obtain and use guns.

We begin with a provision of the 1689 English Bill of Rights "long . . . understood to be the predecessor to our Second Amendment." *Heller*, 554 U.S. at 593. With respect to the right to bear arms, the English Bill of Rights provided "[t]hat the subjects which are Protestants, may have Arms for their Defence suitable to their Conditions, and as allowed by Law." 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441. This right to "*have* arms for their [d]efence" was codified in reaction to the Stuart kings' systemic disarming of the English people in the period leading up to the Glorious Revolution. *See Heller*, 554 U.S. at 592–93. William Blackstone, "whose works . . . constituted the preeminent authority on English law for the founding generation," *Heller*, 554 U.S. at 593–94 (internal quotation marks and citations omitted), described the right announced in that declaration as an "auxilliary right" designed to protect the primary rights of "free enjoyment of personal security, of personal liberty, and of private property." 1 William Blackstone, *Commentaries on the Laws of England* 139–40 (1765). Should these primary rights be violated or attacked, Blackstone explained, "the subjects of England are entitled, in the first place, to the regular administration and free course of justice in the courts of law; next to the right of petitioning the king and parliament for redress of grievances; and lastly to the right of having and using arms for self-preservation and defence." *Id.* at 140.

St. George Tucker, in the "most important early American edition of Blackstone's Commentaries," *Heller*, 554 U.S. at 594, similarly described the English right to bear arms as a necessary means of protecting personal liberties. The English

Bill of Rights, Tucker observed, granted Englishmen "the right of repelling force by force; because that may be absolutely necessary for self-preservation, and the intervention of the society on his behalf, may be too late to prevent an injury." 1 William Blackstone & St. George Tucker, *Blackstone's Commentaries: With Notes of Reference, to the Constitution and Laws, of the Federal Government of the United States, and of the Commonwealth of Virginia* 145 (St. George Tucker ed., 1803).

Blackstone's and Tucker's commentaries indicate that both recognized the right to bear arms in England to have been held by individual British subjects as a means to provide for the preservation of personal liberties. Neither of these authoritative historic accounts states or implies that the English Bill of Rights encompassed an independent right to engage in firearms commerce.

As many historians and courts have observed, the right to bear arms remained important in colonial America. "By the time of the founding, the right to have arms had become fundamental for English subjects." *Heller*, 554 U.S. at 593. Arms were considered an important means of protecting vulnerable colonial settlements, especially from Indian tribes resisting colonial conquest, and from foreign forces. *See* Saul Cornell, *The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History*, 17 Stan. L. & Pol'y Rev. 571, 579 (2006); Joyce Lee Malcolm, *To Keep and Bear Arms* 139 (1994) ("Like the English militia, the colonial militia played a primarily defencive role . . . . The dangers all the colonies faced . . . were so great that not only militia members but all householders were ordered to be armed."). At the same time, colonial governments substantially

controlled the firearms trade.  The government provided and stored guns, controlled the conditions of trade, and financially supported private firearms manufacturers.  *See* Solomon K. Smith, *Firearms Manufacturing, Gun Use, and the Emergence of Gun Culture in Early North America*, 49th Parallel, Vol. 34, at 6–8, 18–19 (2014).

As scholars have noted, in light of the dangers the colonies faced, "[t]he emphasis of the colonial governments was on ensuring that the populace was well armed, not on restricting individual stocks of weapons."  Malcolm, *supra*, at 140.  Historian Saul Cornell has observed that "[i]t would be impossible to overstate the militia's centrality to the lives of American colonists.  For Americans living on the edge of the British Empire, in an age without police forces, the militia was essential for the preservation of public order and also protected Americans against external threats."  Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* 13 (2006). Governmental involvement in the provision, storage, and sale of arms and gunpowder is consistent with the purpose of maintaining an armed militia capable of defending the colonies.   That purpose was later expressly recognized in the prefatory clause to the Second Amendment.

Notably, colonial government regulation included some restrictions on the commercial sale of firearms.  In response to the threat posed by Indian tribes, the colonies of Massachusetts, Connecticut, Maryland, and Virginia all passed laws in the first half of the seventeenth century making it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians.  *See Acts of Assembly, Mar. 1657-8*, *in* 1 William Waller Hening, *The Statutes at Large: Being a Collection of All the Laws of Virginia, from the First*

*Session of the Legislature, in the Year 1619*, at 441 (1823);
1 J. Hammond Trumbull, *The Public Records of the Colony
of Connecticut, Prior to the Union with New Haven Colony,
May, 1665*, at 49, 182 (1850); *Assembly Proceedings,
February-March 1638/9*, *in Proceedings and Acts of the
General Assembly of Maryland, January 1637/8 - September
1664*, at 103 (William Hand Browne, ed., 1883); *Records of
the Governor and Company of the Massachusetts Bay in New
England* 196 (Nathaniel B. Shurtleff, ed., 1853).  At least two
colonies also controlled more generally where colonial
settlers could transport or sell guns.  Connecticut banned the
sale of firearms by its residents outside the colony.
1 Trumbull, *Public Records of the Colony of Connecticut*,
138–39, 145–46.  And under Virginia law, any person found
within an Indian town or more than three miles from an
English plantation with arms or ammunition above and
beyond what he would need for personal use would be guilty
of the crime of selling arms to Indians, even if he was not
actually bartering, selling, or otherwise engaging with the
Indians.  Acts of Assembly, Mar. 1675–76, 2 William Waller
Hening, *The Statutes at Large: Being a Collection of All the
Laws of Virginia, from the First Session of the Legislature, in
the Year 1619*, at 336–37 (1823).[18]

As *Heller* observed, during the 1760s and 1770s, in the
face of growing rebellion, the British Crown sought to disarm
the colonies. 554 US at 594; *see 5 Acts of the Privy Council*

---

[18] Virginia law also provided that all persons were at "liberty to sell
armes and ammunition to any of his majesties loyall subjects inhabiting
this colony."  Laws of Va., Feb., 1676–77, Va. Stat. at Large, 2 Hening,
*supra* at 403.  The liberty to sell arms to Virginians did not, however,
extend to sales to others, and so did not encompass a freestanding right to
sell arms, independent of citizens' right to acquire them.

*of England* § 305, at 401 (1774) (James Munro ed., 1912). Colonial Americans reacted to the embargo by gathering arms for their defense. The General Committee of South Carolina, for example, adopted a resolution in 1774 recommending that all persons immediately supply themselves with powder and bullets, observing that "by the late prohibition of exporting arms and ammunition from England, it too clearly appears a design of disarming the people of America, in order the more speedily to dragoon and enslave them." 1 John Drayton, *Memoirs of the American Revolution from its Commencement to the Year 1776, Inclusive; as Relating to the State of South-Carolina: and Occasionally Referring to the States of North-Carolina and Georgia* 166 (1821) (internal quotation marks omitted).

The panel majority suggested that the Founders adopted the Second Amendment in part because of the experience of the British arms embargo. *See Teixeira*, 822 F.3d at 1054–55. We agree that "[o]ur forefathers recognized that the prohibition of commerce in firearms worked to undermine the right to keep and to bear arms." *Id.* at 1054. But the panel's conclusion that the Second Amendment therefore independently protects the sale of firearms does not follow. The British embargo and the colonists' reaction to it suggest only that the Founders were aware of the need to preserve citizen *access* to firearms in light of the risk that a strong government would use its power to disarm the people.

Like the British right to bear arms, the right declared in the Second Amendment of the U.S. Constitution was thus "meant to be a strong moral check against the usurpation and arbitrary power of rulers, and as a necessary and efficient means of regaining rights when temporarily overturned by usurpation." Thomas M. Cooley, *The General Principles of*

*Constitutional Law in the United States of America* 298 (3d ed. 1898). Early American legislators and commentators understood the Second Amendment and its state predecessors as protecting Americans against tyranny and oppression. They recognized that the availability of arms was a necessary prerequisite to exercising the right to bear arms, as the British arms embargo had made clear. Yet no contemporary commentary suggests that the right codified in the Second Amendment independently created a commercial entitlement to sell guns if the right of the people to obtain and bear arms was not compromised.

These historical materials demonstrate that the right to bear arms, under both earlier English law and American law at the time the Second Amendment was adopted, was understood to confer a right upon individuals to have and use weapons for the purpose of self-protection, at least in the home.[19] The colonies regulated the sale of weapons to some degree.

In short, no historical authority suggests that the Second Amendment protects an individual's right to *sell* a firearm unconnected to the rights of citizens to "keep and bear" arms.[20]

---

[19] We have not decided the degree to which the Second Amendment protects the right to bear arms outside the home. *See Peruta*, 824 F.3d at 939 ("There may or may not be a Second Amendment right for a member of the general public to carry a firearm openly in public. The Supreme Court has not answered that question, and we do not answer it here.").

[20] The panel majority relied on a 1793 statement by Thomas Jefferson for its conclusion that the Second Amendment included the freedom to both purchase and sell arms: "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood

We emphasize that in many circumstances, there will be no need to disentangle an asserted right of retailers to sell firearms from the rights of potential firearm buyers and owners to acquire them, as the Second Amendment rights of potential customers and the interests of retailers seeking to sell to them will be aligned.  As we have noted, firearms commerce plays an essential role today in the realization of the individual right to possess firearms recognized in *Heller*. But restrictions on a commercial actor's ability to enter the firearms market may also, as here, have little or no impact on the ability of individuals to exercise their Second Amendment right to keep and bear arms.  Teixeira alleges that Alameda County's zoning ordinance effectively bars him from opening a new gun store in an unincorporated area of the County.  But he does not—and, given the number of gun stores in the County as a whole and in the unincorporated areas, as well as the geography of the County and the distribution of people within it, likely cannot[21]—allege that residents are meaningfully restricted in their ability to acquire firearms.

Our conclusion that the Second Amendment does not confer a freestanding right to sell firearms is fully consistent with *Heller*, which closely examined the historical record and concluded that, at its core, the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in

---

of some of them."  *Teixeira*, 822 F.3d at 1055 (alteration in original) (quoting Thomas Jefferson, 3 *Writings* 558 (H.A. Washington ed., 1853)). But that was a factual statement—albeit an imprecise one, as we have shown—not a prescriptive one.  Jefferson's observation does not support the conclusion that the Founders understood the right to sell arms was to be independently protected by the Second Amendment.

[21] Again, Teixeira has waived any right to amend his complaint in this litigation, *see supra* note 15.

defense of hearth and home."  554 U.S. at 635.  Later cases have also examined firearms restrictions with respect to the burden on a potential gun owner or user, even when the challenge is brought by a commercial actor engaged in supplying arms or related services.  In *Ezell II*, for example, the Seventh Circuit held that Chicago's restrictions on shooting range locations caused a Second Amendment injury because it "severely limit[ed] Chicagoans' Second Amendment right to maintain proficiency in firearm use via target practice at a range," not because a range operator has any protected interest in operating a shooting range in the city.  846 F.3d at 890.

Similarly, in a suit brought by firearms dealers and residents challenging a Chicago ordinance that banned "virtually all sales and transfers of firearms inside the City's limits," the District Court for the Northern District of Illinois examined the burden imposed by the sales prohibition on "law-abiding residents who want to exercise their Second Amendment right," not on firearms dealers.  *Ill. Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 940, 942; *see also Nat'l Rifle Ass'n*, 700 F.3d at 199–204 (examining whether a ban on firearms sales to minors burdened conduct protected by the Second Amendment by examining the burden on minors' rights to acquire firearms, not the burden on sellers).

Our holding does not conflict with *United States v. Marzzarella*.  *Marzzarella* cautioned that if there were a categorical exception from Second Amendment scrutiny for all laws imposing conditions on the commercial sale of firearms, "it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms."  614 F.3d at 92 n.8.  *Marzzarella* rightly observed that in contemporary society, permitting an overall ban on

gun sales "would be untenable under *Heller*," *id.*, because a total prohibition would severely limit the ability of citizens to *acquire* firearms. *Marzzarella* did not consider a situation in which the right of citizens to acquire and keep arms was not significantly impaired, yet commercial retailers were claiming an independent right to engage in sales.

Finally, Teixeira invokes an analogy to First Amendment jurisprudence for his contention that the Second Amendment independently protects commercial sellers of firearms, suggesting that gun stores are in the same position as bookstores, print shops, and newspapers. The analogy fails. If Teixeira were a bookseller aiming to open up shop in Alameda County, the fact that there were already ten other booksellers indeed would not matter. But he is a gun seller, and for reasons explained below, that changes the constitutional calculus.

First, the language of the Second Amendment is specific as to whose rights are protected and what those rights are, while the First Amendment is not. Compared to the Second Amendment's declaration, after an announcement of its purpose in the introductory clause, that a right of "the people" to "keep and bear Arms, shall not be infringed," the First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech, or of the press" is far more abstract. And, whereas the Second Amendment identifies "the people" as the holder of the right that it guarantees, the First Amendment does not state who enjoys the "freedom of speech," nor does it otherwise specify or narrow the right.

Second, the Supreme Court has long recognized that speech necessarily entails communication with other

people—with *listeners*. *See Talley v. California*, 362 U.S. 60, 64 (1960) ("[S]uch [a] . . . requirement would tend to restrict freedom to distribute information and thereby freedom of expression."); *Hill v. Colorado*, 530 U.S. 703, 716 (2000) ("The right to free speech, of course, includes the right to attempt to persuade others to change their views . . . ."). Merely protecting one's right to speak without more—to lecture in vacant auditoriums or in remote forests, or to write pamphlets without being permitted to hand them out—would assuredly not satisfy the First Amendment.

Selling, publishing, and distributing books and other written materials is therefore *itself* expressive activity. Sellers, publishers, and distributors of such materials consequently have freestanding rights under the First Amendment to communicate with others through such protected activity. The Supreme Court so observed in *Smith v. California*, 361 U.S. 147, 150 (1959), stating that "the free publication and dissemination of books and other forms of the printed word furnish very familiar applications of the[] constitutionally protected freedoms [of speech and of the press]." The right to express one's views, orally and in writing, that is protected by the First Amendment thus *necessarily* entails reaching an audience, including through the distribution of written material. *See id.* "Liberty of circulating is as essential to th[e] freedom [of the press] as liberty of publishing . . . ." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (quoting *Ex parte Jackson*, 96 U.S. 727, 733 (1877)).

The circulation and distribution of expression, in turn, often necessitates retail transactions by booksellers and other merchants, as free speech often isn't free in the monetary sense. As the Supreme Court has noted, "virtually every

means of communicating ideas in today's mass society requires the expenditure of money. The distribution of the humblest handbill or leaflet entails printing, paper, and circulation costs." *Buckley v. Valeo*, 424 U.S. 1, 19 (1976). In light of this commercial reality, the fact that "the dissemination [of books and other forms of the printed word] takes place under commercial auspices" does not remove those forms of communication from First Amendment protection. *Smith*, 361 U.S. at 150.

In short, bookstores and similar retailers who sell and distribute various media, unlike gun sellers, are *themselves* engaged in conduct directly protected by the First Amendment. They are communicating ideas, thoughts, and other forms of expression to those willing to hear or read them. Unlike gun sellers, they are "not in the position of mere proxies arguing another's constitutional rights." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 64 n.6 (1963).

So, for example, if Teixeira wanted to sell books and magazines rather than ammunition and magazines, the existence of ten other bookshops in Alameda County—or on a single street in Alameda County—that could sell his potential customers the same material would be irrelevant to his claimed right to distribute and sell books. The First Amendment grants *him* the right to speak and disseminate ideas, not merely his customers the right to hear them.[22] But

---

[22] *See Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 n.15 (1976) ("We are aware of no general principle that freedom of speech may be abridged when the speaker's listeners could come by his message by some other means . . . ."). Though *Virginia State Board* dealt with the right of *listeners* to hear particular speech, the Court identified it as "reciprocal" to the right of the speaker.

Teixeira sells guns instead of books, and the act of selling firearms is not part or parcel of the right to "keep and bear arms." Yet Teixeira is asserting the right to sell guns no matter how many other gun stores there are in the jurisdiction.

Here, the gun sellers are instead in an analogous position to medical providers in the Fourteenth Amendment context. When medical providers have challenged laws restricting the distribution of contraceptives and provision of abortions, courts consistently examine whether the challenged laws burden their patients' right to access reproductive health services, *not* whether the laws burden any putative right of the provider. *See Whole Woman's Health*, 136 S. Ct. at 2312–13, 2316 (in suit brought by abortion providers, examining whether admitting privileges and surgical center requirements imposed on health providers burdened a woman's choice to obtain a pre-viability abortion); *Carey*, 431 U.S. at 684–89 (striking down a statute forbidding the distribution of certain contraceptives because the statute constrained a woman's choice of whether to have a child); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846, 886–87 (1992) (examining regulations on abortions with regard to the burden imposed on women seeking abortions).[23]

---

*Id.* at 757. It follows that the *speaker's* right is undiminished by the availability of other people merchandising the same ideas and messages.

[23] The same principle applies in the Sixth Amendment context. The Sixth Amendment provides a criminal defendant the right to an attorney in criminal proceedings, but does not confer upon any attorney a corresponding right to represent a defendant (much less to do so for a fee). *See Faretta v. California*, 422 U.S. 806, 819–20 (1975) ("The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense.

Never has it been suggested, for example, that if there were no burden on a woman's right to obtain an abortion, medical providers could nonetheless assert an independent right to provide the service for pay.

As we have demonstrated, the Second Amendment does not independently protect a proprietor's right to sell firearms.[24] Alameda County's Zoning Ordinance, to the extent it simply limits a proprietor's ability to open a new gun store, therefore does not burden conduct falling within the Amendment's scope and is "necessarily allowed by the

---

It is the accused, not counsel, who must be 'informed of the nature and cause of the accusation,' who must be 'confronted with the witnesses against him,' and who must be accorded 'compulsory process for obtaining witnesses in his favor.' . . . The counsel provision supplements this design. It speaks of the 'assistance' of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant . . . ."). Counsel do have their own right not to have their speech restricted when making legal arguments and giving clients advice, but that right derives from the First, not the Sixth, Amendment. *See, e.g.*, *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 548 (2001).

[24] Our conclusion is consistent with the Fourth Circuit's determination in its unpublished decision in *United States v. Chafin*, 423 F. App'x 342, 344 (4th Cir. 2011), that no historical authority "suggests that, at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm" (emphasis in original). *See also Mont. Shooting Sports Ass'n v. Holder*, No. CV-09-147-DWM-JCL, 2010 WL 3926029, at *21 (D. Mont. Aug. 31, 2010) ("*Heller* said nothing about extending Second Amendment protection to firearm manufacturers or dealers. If anything, *Heller* recognized that firearms manufacturers and dealers are properly subject to regulation by the federal government under existing federal firearms laws.").

Amendment." *Peruta*, 824 F.3d at 939; *see also Marzzarella*, 614 F.3d at 89.

**AFFIRMED.**

---

OWENS, Circuit Judge, concurring:

I join all but Part II.D of the majority opinion. In my view, we need not decide whether the Second Amendment guarantees the right to sell firearms. It is enough that *Heller* left intact "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures[.]"). The ordinance at issue here falls within that category of "presumptively lawful regulatory measures," *Heller*, 554 U.S. at 627 n.26, and plaintiffs therefore "cannot state a viable Second Amendment claim." *Nordyke v. King*, 681 F.3d 1041, 1044 (9th Cir. 2012) (en banc). As the dissent to the original panel decision put it, all "we're dealing with here is a mundane zoning dispute dressed up as a Second Amendment challenge." *Teixeira v. County of Alameda*, 822 F.3d 1047, 1064 (9th Cir. 2016) (Silverman, J., dissenting).

TALLMAN, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's decision to affirm the district court's dismissal of the Second Amendment facial challenge. Majority Op. II. A–C.  However, I respectfully dissent from the dismissal of the constitutional challenge as applied to Teixeira.  Majority Op. II. D.  The majority's analysis of the Second Amendment challenge to locating a full-service gun shop in an unincorporated area of Alameda County, which I will call San Lorenzo, substantially interferes with the right of its customers to keep and bear arms.  The impact of this county ordinance on the fundamental rights enshrined in the Second Amendment cannot be viewed in a vacuum without considering gun restrictions in California as a whole.  I fear today's decision inflicts yet another wound on our precious constitutional right.

Teixeira's facial Second Amendment challenge fails because appellants cannot demonstrate that the zoning ordinance is unconstitutional in *all* of its applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987).  Notably, Teixeira did not allege that none of the existing gun stores in the county can comply with the ordinance.[1]  The district court properly dismissed the facial challenge to Alameda County's zoning ordinance.

---

[1] The complaint concedes and its attachments state that there is at least one such store that has complied with the Alameda County ordinance and sells firearms to county residents.  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) ("We need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint.").

Teixeira, however, has the better argument on the as-applied challenge. Teixeira alleges that the restrictive zoning rules in the ordinance make it virtually impossible to open a new, full-service gun store in unincorporated Alameda County, and that makes it very difficult for individuals who wish to exercise their Second Amendment rights to obtain, maintain, and comply with the burdensome California state and federal laws which govern acquisition, ownership, carrying, and possession of firearms protected by the Second Amendment. Teixeira should be permitted to engage in further fact-finding to test whether the ordinance meets at least intermediate scrutiny in establishing its challenge.

We have adopted a two-step inquiry: (1) "whether the challenged law burdens conduct protected by the Second Amendment and (2) if so, . . . to apply an appropriate level of scrutiny." *United States v. Chovan*, 735 F.3d 1127, 1136–37 (9th Cir. 2013). Step One asks whether the conduct falls outside the historical scope of the Second Amendment. If so, the claim fails. To make this determination we ask: (1) whether the regulation is one of the "presumptively lawful regulatory measures" identified in *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008), or (2) "whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Jackson v. City and Cty. of San Francisco*, 726 F.3d 953, 960 (9th Cir. 2014). If neither of these are met, then the law falls within the historical scope of the Second Amendment and the analysis proceeds to Step Two.

Under Step Two the appropriate level of scrutiny is determined by examining how closely the law comes to the core of the burdened Second Amendment right and the

severity of that burden.  *Chovan*, 735 F.3d at 1138.  First, we must determine if Alameda County's ordinance is a "presumptively lawful regulatory measure" as identified in *Heller*.  554 U.S. at 627 n. 26.  The majority properly notes that the Supreme Court's language is "opaque," but declines to clarify this precedent for our circuit.  Majority Op. at 26.  In *Heller*, the Court declared "nothing in our opinion should be taken to cast doubt on longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms."  554 U.S. at 626–27.  These are "presumptively lawful regulatory measures."  *Id.* at 627 n.26.

As I read the footnote, "longstanding regulatory measures" refers to congressional measures that regulate the sale of firearms, such as the validity of the Federal Firearms Act, its implementing regulations, and the Bureau of Alcohol, Tobacco, Firearms and Explosives' historical enforcement of sales, exchanges, and prohibitions on dealing in certain types of firearms and with potential customers.  *McDonald v. City of Chicago*, 561 U.S. 742, 777 (2010).  Justice Scalia's footnote in *Heller* could not have been addressing county ordinances meant to restrict firearm acquisition and possession as much as a local government can get away with.  The record here establishes beyond cavil the animus of the Alameda County Board of Supervisors to Second Amendment rights.  I agree with Judge Bea that the Alameda County ordinance does not fall within the *Heller* categories and does not earn its presumption of lawfulness.  *See* Bea dissent at pp. 58–61.

Nevertheless, even if we found that the ordinance fell within the *Heller* categories and was "presumptively lawful," that presumption is subject to rebuttal.  Teixeira should have been permitted to return to the district court to conduct

discovery and "rebut this presumption by showing the regulation does have more than a de minimis effect upon his [claimed Second Amendment] right." *Heller v. District of Columbia*, 670 F.3d 1244, 1273 (D.C. Cir. 2011) (*Heller II*).

Second, if a law does not fit within the language of *Heller*, the court determines if a challenged regulation prohibits conduct that was traditionally protected by the Amendment. *Jackson*, 746 F.3d at 960. The majority concludes "the Second Amendment does not confer a free standing right, wholly detached from any customer's ability to acquire firearms, upon a proprietor of a commercial establishment to sell firearms." Majority Op. at 25. Maybe so.

But we need not find a freestanding right to sell firearms. Rather, the ability of lawful gun owners to find a reasonably available source to buy, service, test, and properly license firearms is an attendant right to the fundamental right to bear arms.[2] The majority properly notes that the "Second Amendment protects ancillary rights necessary to the realization of the core right to possess firearms for self-defense," but fails to apply that protection here to ensure the ordinance imposes no unreasonable restrictions on the right

---

[2] I disagree with the majority's assumption that the existing federally licensed gun stores elsewhere in the county offer the full range of services Teixeira proposed to offer in San Lorenzo. The West County Board of Zoning Adjustments approved a variance for Teixeira's location and stated that "Unincorporated Alameda County currently has four (4) licensed firearms sales business [sic]." Merely possessing such a license tells us nothing about whether the licensee sells only long guns, handguns, or ammunition. Nor can we tell whether gunsmithing services, training/education classes, a target range, or anything else attends mere possession of the license at each location.

to lawfully acquire and maintain firearms for the defense of hearth and home.  Majority Op. at 14.

We found in *Jackson* that a regulation which "eliminate[ed] a person's ability to obtain or use ammunition" was subject to heightened scrutiny because it had the potential to make "it impossible to use firearms for their core purpose."  746 F.3d at 967.  We face an analogous situation.  The Alameda County zoning ordinance precludes Teixeira from opening a new gun store in San Lorenzo.  The lawful sale of arms to qualified people who wish to acquire and keep them for employment (e.g., police officers and security guards), self-defense, hunting, target shooting, protection of commercial occupations—such as carrying valuables like diamonds, protection of business premises, or other such legal purposes—need freedom to purchase and maintain the very arms they have the right to bear.  Without the ability to establish reasonable locations that sell and service these arms, the ordinance "make[s] it impossible to use firearms for their core purpose" of self-defense.  *Id.*  As applied here, the ordinance potentially renders the right to bear arms meaningless.  When considered in combination with similar burdensome regulations by other San Francisco Bay Area cities and counties, local officials do not need to explicitly ban firearms to block gun owners from reasonable access to gun stores.[3]  *Cf. Ill. Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014)

---

[3] And it is no answer, as my colleagues suggested in *Jackson*, that while San Francisco could ban the sale of hollow point ammunition (carried by many law enforcement officers), putative purchasers could simply buy their ammunition elsewhere and bring it back to San Francisco since it was not illegal to possess hollow point rounds.  746 F.3d at 968.

(striking down an ordinance seeking to prohibit all firearms sales).

The ability to acquire guns and ammunition, and to keep them in operable condition, is "indispensable to the enjoyment" of the fundamental right to bear arms as much as access to a shooting range. *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579 (1980). Judge O'Scannlain's scholarly opinion for our panel in this case explains why this is true. *See* 822 F.3d 1047, 1053–56 (9th Cir. 2016).

All would agree that a complete ban on the sale of firearms and ammunition would be unconstitutional. History supports the view that the Second Amendment must contemplate the right to sell firearms if citizens are to enjoy the core, fundamental right to own and possess them in their homes. *Chovan*, 735 F.3d at 1133. The majority recounts that states historically imposed criminal sanctions for giving or selling arms to the Indians. Majority Op. at 31. They urge this is evidence that the right to sell arms was not implicated by the Second Amendment. However, this merely reiterates the longstanding prohibition on the sale of firearms to certain forbidden persons acknowledged in *Heller.* At the time such discriminatory laws were adopted, the fledgling Nation was treating our ancestral inhabitants as if they were convicted felons or illegal aliens, who today are still banned by law from possessing or acquiring firearms. 18 U.S.C. § 924; 27 C.F.R. § 478.32.

In light of the British embargo on the sale of arms in 1774 to prevent the Colonists from resisting the tyranny of King George III, it is understandable that the Framers would want to protect not only the right to bear arms, but

correspondingly, the right to sell and acquire them. *See* David B. Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 CHARLESTON L. REV. 286 (2012). Throughout history and to this day the sale of arms is ancillary to the right to bear arms.[4]

Based upon the Second Amendment's text and history, the Alameda County ordinance imposes prohibitions that may indeed fall within the scope of Second Amendment protection. Therefore, we must reach Step Two and ask whether the ordinance unduly interferes with the right to acquire and possess firearms for self-defense. So long as the ordinance does not unduly impede that right, it will ultimately pass constitutional muster. But plaintiffs are entitled to try to establish evidence through discovery to support their plausible claim. Teixeira has stated sufficient grounds, which, if supported by such discovery, may well undermine the nexus between the means chosen and the ends sought when examined under the lens of at least intermediate scrutiny.

Today's decision perpetuates our continuing infringement on the fundamental right of gun owners enshrined in the Second Amendment. We cannot analyze constitutional rights in a vacuum; instead, we must analyze the totality of the impact of gun control regulations like these—local, state, and federal—in determining how severely the fundamental liberty protected by the Second Amendment is being burdened. In states like California, that burden is becoming substantial in

---

[4] "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." *Teixeira v. County of Alameda*, 822 F.3d 1047, 1055 (9th Cir. 2016) (quoting Thomas Jefferson, 3 *Writings* 558 (H.A. Washington ed., 1853)).

light of continuing anti-gun legislation[5] and our decisions upholding such laws.  *See Chovan*, 735 F.3d 1127 (9th Cir. 2013); *Jackson*, 746 F.3d 953 (9th Cir. 2014) (upholding an ordinance requiring handguns inside the home to be stored in locked containers or disabled with a trigger lock when not being carried on the person); *Peruta v. Cty. of San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 1995 (2017) (holding the Second Amendment does not protect the right to carry a concealed weapon in public where the sheriff's policy required "good cause" to obtain permits to do so, and refused applicants who could offer no justification beyond claiming the need for self-defense); *Silvester v. Harris*, 843 F.3d 816 (9th Cir. 2016) (upholding a 10-day waiting period for purchasers who already had a concealed-carry permit and already cleared a background check); *Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) (upholding an Alameda County ordinance that regulates the sale of firearms at gun shows).

Our cases continue to slowly carve away the fundamental right to keep and bear arms.  Today's decision further lacerates the Second Amendment, deepens the wound, and resembles the Death by a Thousand Cuts.

---

[5] *Peruta v. Cty. of San Diego* outlines part of California's "multifaceted statutory scheme regulating firearms." 824 F.3d 925–26; *see also* Cal. Penal Code Pt. 6, T. 4 (regulating firearms generally); *see also* Cal. Penal Code Pt. 6, T. 4, D. 5 (regulating the carrying of firearms in California).

BEA, Circuit Judge, dissenting:

The Second Amendment right to "keep and bear arms" would not mean much unless one could lawfully purchase and use arms. Section 17.54.131 of the Alameda County Ordinance Code (the "Ordinance") targets firearm stores; it prohibits them within 500 feet of residences.

When a government regulation affects one's right to purchase and use a firearm, it may be challenged as impeding the exercise of the Second Amendment right. To determine the validity of such a regulation, we turn to Supreme Court and Ninth Circuit precedents for guidance.

Those precedents require we first determine whether the regulation—here, the Alameda ordinance—burdens the right granted by the Second Amendment. If it does, we next examine whether there is a specific governmental interest to be served to justify the burden. If there is, we then measure how severely the right is burdened, to see how much judicial scrutiny into the workings of the regulation is required.

The majority opinion short-circuits this process by making two errors. First, it holds that the Alameda ordinance does not "meaningfully" burden the right to purchase and use firearms because other gun stores are nearby Appellants' proposed location. Second, it holds that Appellants have no Second Amendment rights to sell firearms. I'll deal with these two errors in turn.

I.

In rejecting the panel opinion's conclusion that the Ordinance burdens the right to *buy* guns, today's majority

does not deny that such a right exists. Rather, it concludes only that Appellants fail sufficiently to allege a violation of that right because there are other gun sellers near the location of their proposed gun store, including a Big 5 Sporting Goods store just 600 feet away.

For the majority, a challenge to the Alameda Ordinance requires that the Ordinance be not just a burden to the exercise of Second Amendment rights, but a "meaningful[]," Majority Op. 21,  or "substantial," Majority Op. 22, burden before any type of judicial scrutiny, beyond the very permissive "rational review" standard, be applied. This requirement misreads our precedent in *United States v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) in two ways. First, *Chovan* did not require the burden to be "meaningful" or "substantial" to proceed to the second step in the analysis, the "severity" of the burden. It required only that the right be burdened. Second, *Chovan* explicitly required the "severity" of the burden to be examined at its second step, as necessary to choose the level of judicial scrutiny to be applied. *Id.* at 1138.

Here, when read in the light most favorable to Appellants,[1] the first amended complaint *does* allege a burden on their prospective customers' Second Amendment rights:[2]

---

[1] *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 109 (1979) (on a motion to dismiss, "[w]e . . . construe the complaint in favor of the complaining party" (internal quotation marks and ellipses omitted)).

[2] The complaint alleges that "a full service gun store located in San Lorenzo," of the kind contemplated by Appellants, "would be a success, in part, because existing retail establishments . . . do not meet customer needs and demands." Specifically, the existing "general sporting good

It alleges a burden on the ability of those prospective customers to obtain training, repairs, and other gun-related services *at the same location* at which they buy their firearms. *Teixeira v. County of Alameda*, 822 F.3d 1047, 1056 (9th Cir. 2016); *see also Ezell v. City of Chicago*, 651 F.3d 684, 696–97 (7th Cir. 2011) (rejecting Chicago's argument that its ban on firearms ranges passed constitutional muster because residents could travel outside the city to satisfy their needs elsewhere, explaining that "[t]he pertinent question is whether the Second Amendment prevents the City Council from banning firing ranges everywhere in the city; that ranges are present in neighboring jurisdictions has no bearing on this question"). Just as Chicago could not outlaw target ranges in Chicago, Alameda County could not outlaw combined firearm sales, training, licensure, smithy and storage services in the unincorporated areas of Alameda County.

In rejecting this burden, the majority concludes that the Second Amendment does not guarantee a particular "retail experience" to a gun buyer. *See* Majority Op. 20 n.13. This characterization of the services to be offered by Appellants pooh-poohs the alleged needs and demands of the firearm buyers to meet those several needs and demands at a single gun store. The majority assumes there is no advantage gained, nor burden lessened, to firearm customers in the exercise of their Second Amendment rights in being able to receive training, establish licensure to possess firearms, obtain smithy and maintenance services, and deposit firearms all in one place. But combining the sales of products with services necessary for their use is not merely a "retail experience"; it is an essential form to meet the "needs and demands" of

stores" do not provide "personalized training and instruction in firearm safety and operation" as well as "arms and ammunition."

customers. *See* Venkatesh Shankar, Leonard L. Berry, and Thomas Dotzel, *A Practical Guide to Combining Products and Services*, Harvard Business Review (November 2009) ("These days, many firms are trying to mix products with services in an effort to boost revenue and balance cash flows. . . . Such offerings are commonplace—think Apple (the iPod product combined with the iTunes service) and Xerox (copiers and printers bundled with maintenance or customer support services)."). Would it be a burden for a burglary victim to be required to make an actionable crime report separately at City Hall, the Hall of Justice and the local police station, rather than call "911?" Or would the majority simply tell the burgled homeowner that he wasn't burdened by having to visit three municipal offices because he wasn't entitled to a particular "citizen's experience?"

The burden exists and was sufficiently alleged. The proper analysis under *Chovan* is as to the *severity* of the burden. But of course, if one were to admit that a "burden" existed as to the customers' Second Amendment rights, one would have to consider the severity of such burden under an intermediate or strict scrutiny test, rather than the permissive "rational review" standard invoked by the majority opinion. And that judicial scrutiny the majority opinion avoids altogether by erroneously, in my view, finding that the customers' Second Amendment rights were not "meaningfully" burdened.

Were one to find that yes, the customers' Second Amendment rights were at least lightly burdened, under *Chovan* intermediate scrutiny would have to be employed to analyze the validity of Alameda County's actions. The first

question would be whether the County has a "substantial"[3] governmental interest in prohibiting gun stores to be located within 500 feet of residences. What could that substantial interest be?

The majority (albeit perhaps inadvertently) supplies the answer in its first sentence: "to preserve the health and safety of its residents." Majority Op. 7; *see also Teixeira*, 822 F.3d at 1060–61 (recognizing that one of the Ordinance's asserted purposes was "protecting public safety and preventing harm in populated, well-traveled, and sensitive areas"). There are two problems with invoking this "health and safety" claim as a "substantial governmental interest" to justify the red-lining of Appellants' gun store.

First, Appellants' complaint clearly alleges that even the County doesn't believe such purported justification; thus it is pretextual. *See Romer v. Evans*, 517 U.S. 620, 632 (1996) (holding that a regulation "lack[ed] a rational relationship to legitimate state interests" because "its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects"); *U.S. Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973) ("[A] bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest."). The complaint recounts the "adoptive admissions and/or undisputed facts regarding the [Alameda County Community Development Agency]

---

[3] *See Jackson*, 746 F.3d at 965 (identifying "the first prong of intermediate scrutiny review" as an inquiry into "whether the government's stated objective is significant, *substantial*, or important" (emphasis added)).

Planning Department's findings." Among those admissions and undisputed facts, we find:

> "Will the use [the proposed gun store], if permitted, under all circumstances and conditions of this particular case, materially affect adversely the health or safety of persons residing or working in the vicinity, or be materially detrimental to the public welfare or injurious to property or improvements in the neighborhood?"

The County answers: "No." As is said in Spain, "Mas claro, ni el agua" (Not even water could be clearer). This admission by the County calls into question whether the Ordinance would pass even the "rational review" test, redolent as it is in deference to government regulation. It is much less likely that the health and safety of Alameda residents can be stated with a straight face as a "substantial" or "compelling" justification for the regulation as is required under the intermediate scrutiny test. No sociological study is needed to assert that gun buyers and gun sellers constitute a "politically unpopular group" in Alameda County within the meaning of *Moreno.* That the vote to deny Appellants' variance was purely political, and not based on an independent finding of danger to citizens, is confirmed by the record's utter lack of even the most minimal explanation for the Supervisors' vote.

Second, there is nothing in the record which intimates that locating a gun store within 500 feet of a residence creates any risk to the residents. The employees of a gun store are all background checked. The purchasers must prove proper backgrounds to buy. Our "intermediate scrutiny" jurisprudence requires some type of proof of risk of the harm

the government seeks to prevent to justify its prohibitive regulation. Thus, in *Chovan* statistical studies of recidivism in domestic violence offenders provided the proof of a substantial governmental health and safety interest in prohibiting domestic violence misdemeanants from possessing firearms. *Chovan*, 735 F.3d at 1140–41. Likewise, in *Jackson*, a legislative finding that "hollow-point bullets are designed to tear larger wounds in the body by flattening and increasing in diameter on impact" was sufficient to establish that a ban on the sale of such ammunition furthered San Francisco's asserted interest of "reducing the fatality of shootings." *Jackson*, 746 F.3d at 969 (internal quotation marks omitted); *see also Ezell*, 651 F.3d at 709 (rejecting Chicago's argument that "firing ranges create the risk of accidental death or injury and attract thieves wanting to steal firearms" because the city had "produced no empirical evidence whatsoever and rested its entire defense of [its] range ban on speculation about accidents and theft").

Here, as in *Ezell*, the majority merely speculates that the proximity of guns, in a gun store, threatens the County residents' health and safety. The County doesn't even speculate. Not only do the Planning Department of the County's Community Development Agency and the West County Board of Zoning Adjustments categorically deny that the threat exists, but ironically, it is just the other way around: As noted in the panel's now-vacated decision, it is precisely in residences where the core Second Amendment right to keep and bear arms is most pronounced and protected. *See Teixeira*, 822 F.3d at 1061. The closer the store to residences, the easier for residents to buy guns and the safer the residences.

In sum, this case does not present merely a "zoning dispute" dressed up in Second Amendment garb. *Id.* at 1064 (Silverman, J., dissenting). If there were a zoning measure of general application to bar retail stores of any kind within 500 feet of residences to lower traffic or noise, we wouldn't be here. But when law-abiding citizens are burdened in the exercise of their Second Amendment rights to purchase firearms and train, license, and maintain them for their self-defense, the Government must justify its actions by proving the existence of a substantial governmental interest and that its regulation is reasonably tailored to achieve such interest—the intermediate scrutiny test. *See Jackson*, 746 F.3d at 965. That, it has not done.

## II.

The panel opinion persuasively lays out the historical evidence demonstrating that the right to sell firearms is "part and parcel of the historically recognized right to keep and to bear arms." *See Teixeira*, 822 F.3d at 1054–56 (citing, *inter alia*, a law in colonial Virginia providing for the "liberty to sell armes and ammunition to any of his majesties loyall subjects inhabiting this colony"; Thomas Jefferson's observation in 1793 that "our citizens have always been free to make, vend, and export arms"; and an 1871 Tennessee Supreme Court decision which recognized that "the right to keep arms, necessarily involves the right to purchase them" (internal quotation marks, brackets, and citations omitted)). I will not rehash that historical evidence here.

Instead, I will address the majority's assertion that the language of *District of Columbia v. Heller*, 554 U.S. 570 (2008), is "opaque" regarding the Second Amendment's application to "conditions and qualifications on the

commercial sale of firearms." Majority Op. 26. In my view, *Heller*'s language is perfectly clear: such regulations are "presumptively lawful" *only if* they are "longstanding." *Heller*, 554 U.S. at 626–27; *see also Teixeira*, 822 F.3d at 1056–58.

In *Heller*, the Supreme Court recognized for the first time that the Second Amendment protects "an individual right to keep and bear arms." *Heller*, 554 U.S. at 595. The Court then said the following about the scope of that right:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on *longstanding* prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or *laws imposing conditions and qualifications on the commercial sale of arms*.

*Id.* at 626–27 (emphasis added). Then, in a footnote, the Court added: "We identify these *presumptively lawful regulatory measures* only as examples; our list does not purport to be exhaustive." *Id.* at 627 n.26 (emphasis added).

In my view, the County cannot avail itself of the italicized limitations for "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms," because it has failed to carry its burden of establishing that the Ordinance is "longstanding" or is in a class of longstanding prohibitions as to the location of firearms sales and services

in particular. Indeed, the County has offered *no* evidence demonstrating that the Ordinance is the kind of regulation which Americans would have seen as permissible at the time of the adoption of the Second Amendment. *See Teixeira*, 822 F.3d at 1058. Though the majority has unearthed its own historical narrative to that effect, *see* Majority Op. 28–34, none of those materials were presented by the County to the district court or in the County's brief on appeal.

There can be no doubt that evidence the regulations are "longstanding" is required to claim *Heller's* carve-out for "presumptively lawful" "conditions and qualifications on the commercial sale of arms." In the above-quoted passage from *Heller*, the object of the preposition "on" in the phrase "cast doubt on" is a disjunctive parallel construction: "longstanding prohibitions on the possession of firearms by felons and the mentally ill, *or* laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, *or* laws imposing conditions and qualifications on the commercial sale of arms." Thus, under the series-qualifier canon, the adjective "longstanding" applies to each phrase within the parallelism—including "laws imposing conditions and qualifications on the commercial sale of arms." *See* Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147–151 (West 2012).

True, if the adjective "longstanding" *describes* "laws imposing conditions and qualifications on the commercial sale of arms," rather than *qualifying* that phrase, then historical evidence would not be necessary to claim the carve-out. But this reading is untenable, because then *any* law "imposing conditions and qualifications on the commercial sale of arms" would be "longstanding"—even if it were invented and enacted yesterday. "Longstanding" therefore

tells us *which* "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful," and the County has failed to demonstrate that the Ordinance falls within this category. *See also Teixeira*, 822 F.3d at 1058 ("That the Nation's first comprehensive zoning law did not come into existence until 1916, while not dispositive, provides at least some evidence that Alameda County's Conditional Use Permit requirement is not heir to a longstanding class of historical prohibitions or regulations."). Thus, neither the historical evidence nor the language of *Heller* supports the majority's conclusion that the Second Amendment offers no protection against regulations on the sale of firearms.

I respectfully dissent.